2002 SD 21

**Gary KNECHT, Applicant and Appellant,**

v.

**Douglas L. WEBER, Warden, South Dakota State Penitentiary, Respondent and Appellee.**

**No. 21846.**

Supreme Court of South Dakota.

Argued Oct. 2, 2001.

Decided Feb. 13, 2002.

Michael J. Butler, Sioux Falls, SD, Attorney for applicant and appellant.

Mark Barnett, Attorney General, Gary Campbell, Assistant Attorney General, Pierre, SD, Attorneys for respondent and appellee.

AMUNDSON, Justice.

[¶ 1.] Gary Knecht (Knecht) appeals an order dismissing his petition for Writ of Habeas Corpus, raising three separate claims of ineffective assistance of trial counsel. We affirm.

### FACTS

[¶ 2.] Knecht was convicted of first degree manslaughter committed "without a design to effect death, and in a heat of passion, but in a cruel and unusual nature" under SDCL 22–16–15(2) as a result of a deadly altercation at the Legion Club in Martin, South Dakota. A more detailed version of the facts surrounding the shooting is set forth in Knecht's direct appeal to this Court, in which we affirmed the conviction. *See State v. Knecht,* 1997 SD 53, 563 N.W.2d 413.

[¶ 3.] Knecht filed an application for writ of habeas corpus on October 14, 1999, alleging that his conviction was unconstitutional based on ineffective assistance of counsel. The habeas court held an evidentiary hearing on June 29–30, 2000. At the hearing, Knecht called Dr. Donald M. Habbe, the pathologist who performed Marshall's autopsy, Dr. Thomas L. Bennett, another pathologist, and Gary Colbath, Jr., Knecht's defense lawyer at trial.[1] The habeas court dismissed Knecht's petition for habeas relief. Knecht now appeals the habeas court's decision, raising the following issues:

1) Whether counsels' failure to challenge the sufficiency of the evidence to support the jury's finding that the death was effected in a cruel and unusual manner on direct appeal deprived Knecht of effective assistance of counsel.

2) Whether counsels' failure to object when the prosecutor used the defense expert's report to impeach Knecht's trial testimony deprived Knecht of effective assistance of counsel.

3) Whether counsels' failure to obtain an expert forensic witness deprived Knecht of effective assistance of counsel.

### STANDARD OF REVIEW

[¶ 4.] A review of a habeas case is not an ordinary appeal; thus we have previously recognized that the standard of review is quite limited. *See Krebs v. Weber,* 2000 SD 40, ¶ 5, 608 N.W.2d 322, 324, *overruled on different grounds by Jackson v. Weber,* 2001 SD 30, 637 N.W.2d 19. A habeas review is more restricted, as it is "a collateral attack on a final judgment." *See id.* (citations omitted). The recognized standard of review is to determine: "(1) whether the court has jurisdiction of the crime and the person of the defendant; (2) whether the sentence was authorized by law; and (3) in certain cases whether an incarcerated defendant has been deprived of basic constitutional rights." *Id.* Moreover, the habeas court's decision will not be overturned unless it is clearly erroneous. *Id.* Thus, if the court below was "right for any reason," we may affirm its ruling. *Id.* (citation omitted).

[¶ 5.] In order for Knecht to obtain habeas relief on the grounds of ineffective assistance of counsel, he must pass the two-part test for such a claim. *See Davi v. Class,* 2000 SD 30, ¶ 16, 609

---

1. Gary Colbath, Jr. was co-counsel with his father, Gary Colbath, Sr., who is now deceased.

N.W.2d 107, 112 (recognizing the test for ineffective assistance of counsel as presented in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Under this test, Knecht must first show that trial counsel erred so seriously that "counsel was not functioning as counsel guaranteed by the Constitution." *Id.* Second, he must prove that counsel's error prejudiced him so that he was deprived of a fair trial. *Id.* Prejudice, under the *Strickland* test, requires us to ask: "[B]ut for counsel's unprofessional errors" would the result at trial have been different? *Weddell v. Weber,* 2000 SD 3, ¶ 25, 604 N.W.2d 274, 281 (citation omitted). To find prejudice, the answer must be that there is a reasonable probability of a different outcome. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *See id.* (quoting *Loop v. Class,* 1996 SD 107, ¶ 14, 554 N.W.2d 189, 192). Additionally, this Court has stated:

> In reviewing a habeas court's determination of ineffective assistance of counsel we have stated: whether a defendant has received ineffective assistance of counsel is essentially a mixed question of law and fact. In the absence of a clearly erroneous determination by the circuit court, we must defer to its findings on such primary facts regarding what defense counsel did or did not do in preparation for trial and in his presentation of the defense at trial. This court, however, may substitute its own judgment for

that of the circuit court as to whether defense counsel's actions or inaction constituted ineffective assistance of counsel. *Id.* at ¶ 27 (citations omitted). When analyzing the ineffective assistance of counsel claims, counsel is presumed competent, and this strong presumption must be overcome by Knecht. *See Ramos v. Weber,* 2000 SD 111, ¶ 12, 616 N.W.2d 88, 92.

### DECISION

1. **Whether counsels' failure to challenge the sufficiency of the evidence to support the jury's finding that the death was effected in a cruel and unusual manner on direct appeal deprived Knecht of effective assistance of counsel.**

[¶ 6.] Knecht contends, "as a matter of law, the death of Marshall was not effected in a cruel and unusual manner, even when the evidence adduced at trial is viewed in a light most favorable to the [jury] verdict."[2] In cases reviewing convictions under this statute, we previously have stated that for the defendant to be convicted of manslaughter under subsection two, the evidence must show that the killing was "shocking or barbaric" and in a manner "sufficiently unique in ferocity, duration and manner of accomplishment." *See Graham v. State,* 328 N.W.2d 254, 255 (S.D.1982) (citing *State v. Lange,* 82 S.D. 666, 672, 152 N.W.2d 635, 638 (1967)); *State v. Stumes,* 90 S.D. 382, 385, 241 N.W.2d 587, 589 (1976).[3] Knecht alleges

---

2. On direct appeal, counsel argued that the evidence was insufficient to support the conviction because the evidence was circumstantial. Here, however, habeas counsel contends that counsel should have argued, more specifically, that the evidence was insufficient to prove the "cruel and unusual" element of the crime.

3. The jury was properly instructed on what constitutes "cruel and unusual" as follows:

The phrase "in a cruel and unusual manner" as used in these instructions means the killing was done with some excess of cruelty or refinement or unusual cruelty under the circumstances sufficiently marked to approach barbarity and to make it especially shocking, and the unusual character of the manner displayed in the killing must stand out as sufficiently unusual and unique or peculiar as to astonish and shock persons of normal sensibilities.

that multiple gunshots fired rapidly after an altercation between two men who had been drinking is not so "out of the ordinary" as to establish the "cruel and unusual" element of this crime. *See Lange*, 82 S.D. at 672, 152 N.W.2d at 638 (citations omitted).

[¶ 7.] The habeas court below acknowledged that this was not merely a case of "fisticuffs." It noted that Knecht used a rifle against an unarmed man who arguably had retreated from the altercation. Additionally, Knecht did not shoot just once, but the evidence presented at trial showed ten shots, with six hitting Marshall. Marshall sustained massive internal and external bleeding from the bullet wounds. In fact, when the deputy who first approached Marshall viewed him, the deputy testified that Marshall was so bloody that he was not recognizable. The deputy asked Marshall, who was still conscious for a period after the shooting, who had shot him, and Marshall responded "in a choking voice, 'G–G–Gary' " as he pointed towards the Legion. Marshall could say no more because he began vomiting large amounts of blood.

> Trial Court Instruction Number 16 (derived from South Dakota Pattern Jury Instruction (Criminal 3–24–27)). This instruction has been found adequate by this Court on more than one prior occasion. *See State v. Disbrow*, 266 N.W.2d 246, 254 (S.D.1978); *Stumes*, 241 N.W.2d at 589. It requires the jury to find excessive cruelty was involved in the killing and that the means of accomplishing the act was unusual, unique or peculiar.

4. The cases upon which Knecht relies are not analogous to the facts of this case. The method of killing is distinguishable. See *Lange*, 152 N.W.2d at 637–38 (stating a "single momentary blow, or thrust to the pavement, applied to a willing combatant even when applied with considerable force is not sufficiently unique in ferocity, duration and manner of accomplishment" to create a jury question on the "cruel and unusual" nature of the crime); *State v. Knoll*, 72 Kan. 237, 83

[¶ 8.] A review of the evidence in this case, as done by the habeas court, would obviously allow a jury to find the crime charged was committed in a cruel and unusual manner beyond a reasonable doubt. *See Graham v. State*, 346 N.W.2d 433, 435 (S.D.1984) (*Graham II*) (finding that bludgeoning a man to death with the *repeated* blows of a crow bar was a sufficient factual basis to accept a guilty plea for a homicide committed in a cruel and unusual way). *See also, State v. Jaques*, 428 N.W.2d 260, 267 (S.D.1988) (finding that *repeated* kicks to the head and strikes during a fight was sufficient to support a conviction for manslaughter committed in a cruel and unusual manner). The *Jaques* court stated: "While death from a single shove in a drunken street brawl is not cruel and unusual, a prolonged beating of a woman by a drunken defendant outweighing her by 100 pounds is sufficient to reach the jury on the point." 428 N.W.2d at 267. Similarly, a single gunshot in self-defense would likely not rise to the level of cruel and unusual. Repeated shots in various parts of the body, unnecessary to effectuate self-defense, do rise to that level.[4]

> P. 622, 623 (1905) (stating a death resulting from beating of small man by large man, involving only "unaided bodily strength and energy" did not constitute "cruel and unusual"); *State v. Diggs*, 194 Kan. 812, 402 P.2d 300, 305 (1965) (holding a killing of man found with defendant's wife by beating with fists was not "cruel and unusual"); *People v. Vollmer*, 299 N.Y. 347, 87 N.E.2d 291, 293 (1949) (finding a killing by "a series of blows" did not equal "cruel and unusual"). None of these cases involve the use of a firearm by the perpetrator against an unarmed victim. Knecht does cite to the case of *Tanks v. State*, 71 Ark. 459, 75 S.W. 851 (1903), which involves the use of a dangerous weapon. *Tanks* is also distinguishable, however, as it involved a woman good-naturedly attempting to take a gun from a man when the gun fired accidentally and killed the woman. There is no evidence of an accidental firing of the gun in this case.

[¶ 9.] The habeas court determined that trial counsels' failure to raise this issue at trial or on appeal did not constitute ineffective assistance and we agree.

2. **Whether counsel's failure to object when the prosecutor used the defense expert's report to impeach Knecht's trial testimony deprived Knecht of effective assistance of counsel.**

[¶ 10.] The defense attorneys hired Dr. Stephen Manlove to evaluate Knecht in preparation for trial. They did so in order to have the effect of Knecht's prior military service in Vietnam and his alcohol abuse analyzed as it related to his thought process at the time of this incident. At a pre-trial hearing, defense counsel informed the prosecution and the trial court that Knecht would not be presenting any mental illness defense. The Manlove report was turned over to the State pursuant to the discovery order entered in the case.

[¶ 11.] The State alleges Knecht never indicated that Manlove would not be used to testify on the issue of diminished capacity, which the defense had planned to raise at trial. Also, the defense listed Manlove as a potential witness. Manlove, however, was never called by the defense at trial, nor was Knecht questioned about his own mental condition during direct examination (other than with regard to his drinking on the night of the murder). On cross-examination, however, the prosecutors made use of Manlove's report to impeach Knecht's testimony and defense counsel never objected.

[¶ 12.] Now, Knecht alleges that defense counsel's failure to object to the cross-examination that utilized Manlove's report resulted in ineffective representation because the report was confidential. Knecht argues that SDCL 19–13–2(5),

which provides that "[a] communication is 'confidential' if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication," controls this issue. Knecht submits that it is unfair to use a defendant's inconsistent statements given to a psychiatric professional during an evaluation against him at trial. *See State v. Devine,* 372 N.W.2d 132, 134 (S.D.1985) (stating "[i]t is fundamentally unfair to use defendant's incriminating admission to a psychiatrist during a psychiatric examination as part of the prosecution's case to establish his guilt" (citation omitted)); *United States v. Alvarez,* 519 F.2d 1036, 1045–46 (3rd Cir. 1975) (holding communications in confidence for purpose of obtaining legal advice are confidential).

[¶ 13.] Ordinarily, private communications and the work product of an attorney are confidential communications, incapable of discovery by the opposition. *See* SDCL 19–13–2(5) (defining confidential communications); SDCL 19–13–3 (describing a client's ability to prohibit disclosure of confidential information). Additionally, it has been said "[t]he Fifth Amendment privilege bars the use of an incriminating statement made to a psychiatrist for the purpose of proving a defendant's guilt." *See Devine,* 372 N.W.2d at 134 (citations omitted). There are, however, discovery statutes in this state that require the disclosure of information in order to provide to both the State and Defense information discoverable in preparation of the case. *See, e.g.,* SDCL 23A–13–12 (permitting the prosecution to obtain documentary and tangible evidence of the defendant's that the defendant intends to introduce at trial); SDCL 23A–13–13 (permitting the

prosecution access to scientific tests the defense has and will use at trial).

[¶ 14.] Importantly, when Knecht chose to testify, his prior inconsistent statements could be used as a "basic impeachment tool." *See Lien v. Class*, 1998 SD 7, ¶ 47, 574 N.W.2d 601, 615. Thus, even if Knecht had established that Manlove's report was confidential, he could not hide behind it. *See State v. DeNoyer*, 541 N.W.2d 725, 731–32 (S.D.1995) (holding statements obtained in violation of Miranda may be used to impeach a defendant); *Lanari v. People*, 827 P.2d 495, 501 (Colo.1992) (holding prosecution properly cross-examined a defendant with prior inconsistent statements made to his psychiatrist when the psychiatrist had not been called at trial, but was listed as a potential witness by defense); *People v. Adamski*, 198 Mich.App. 133, 497 N.W.2d 546, 548 (1993) (holding "complainant's prior inconsistent statements to her counselor were admissible for impeachment despite the bar of the statutory privilege"). When Knecht took the stand, he "in essence forfeited his right to object to the use of voluntary statements previously made by him that conflicted with his sworn testimony." *See Lanari*, 827 P.2d at 501.

> Underlying this rule of limited admissibility is the recognition that the search for truth is a fundamental characteristic of criminal proceedings which, absent rules mandated directly by federal or state constitutional provisions, should be encouraged rather than impeded; the acknowledgment that false or perjurious testimony by a defendant would subvert that essential function; and the conclusion that if the prosecution were prohibited from utilizing for impeachment purposes voluntary statements that contradict a defendant's testimony at trial, no effective means would have been available to prevent the defendant from testifying falsely.

*Id.* (citations omitted).

[¶ 15.] Again, Knecht has failed to establish ineffective assistance of counsel.

### 3. Whether counsels' failure to obtain an expert forensic witness deprived Knecht of effective assistance of counsel.

[¶ 16.] Finally, Knecht argues that his trial counsel was ineffective by failing to retain a forensic expert. Knecht and the State disagree as to what occurred just prior to and during the shooting on December 15, 1995. Knecht argues that he shot Marshall during the course of the struggle as Marshall was trying to pull him to the ground. The State alleges that Marshall retreated from the fight before any shots were fired, and in fact, Marshall was a safe distance away from Knecht when the rifle sounded the ten shots.

[¶ 17.] At trial, Habbe, the pathologist who performed Marshall's autopsy, testified for the State. The autopsy report created by Habbe stated the gunshot wound on the outside of Marshall's right calf was an entry point and the wound on the inside of the calf was the exit point of the bullet. Thus, Habbe opined that the bullet entered from the right and exited on the left. After the autopsy, Habbe discussed the wound with a person at the State Crime Lab, and later determined the bullet entered from the wound on the inside of the right calf, exiting on the outside.[5] He testified regarding this change of opinion at trial. During defense counsel's cross-examination of Habbe, the doctor also testified consistently with the defense theory, stating that one could conclude that the victim

---

5. Habbe explained at the habeas hearing that a "shored exit wound" has a ring around it giving it the appearance of an entrance wound.

was on the ground when shot, and that it was possible for Marshall to have walked a short distance after being shot.

[¶ 18.] Knecht alleges that the direction and type of wound on Marshall's calf, in addition to a flattened bullet found in Marshall's right pant leg, are consistent with Marshall lying on his right side at the time of the shooting. This, he argues, is consistent with his allegation that Marshall was shot on the ground during the struggle, rather than after Marshall had retreated and walked away. At the habeas hearing, Knecht called Pathologist Bennett to verify these theories.[6] In addition to the leg wound, Knecht contends Bennett demonstrated how other gunshot wounds were contrary to the State's version of the facts.[7] Based on this conflicting evidence, Knecht alleges that his trial counsel erred by failing to obtain an expert to explain the evidence surrounding the gunshot wounds and the implications that the direction and location of the wounds would have on the defense. He argues that if the defense had utilized an expert, the defense theories could have been corroborated and scientific evidence could have raised serious doubt as to the State's theory of the case.

[¶ 19.] The defense attorney, Gary Colbath, Jr., testified regarding his and his father's reasoning for not electing to hire an expert. It was Gary Colbath, Sr.'s, practice to informally consult with experts before hiring them. In accordance with their normal practice, defense counsel consulted with Dr. Thomas Henry, a forensic pathologist from Denver, Colorado, and friend of Gary Colbath, Sr.[8] Additionally, the Colbaths consulted with Habbe before trial and determined his opinions were not inconsistent with their defense theories. At trial, Habbe also acknowledged that the type of wounds on the victim could have been caused while the victim was walking away from Knecht, or while lying on the ground. Furthermore, the defense elicited adequate medical testimony from Dr. John F. Knecht, Jr.[9] on cross-examination showing that Marshall could have been able to walk away after the wound on his leg was inflicted, supporting the proposition that Knecht shot Marshall during the argument, not after retreat. Additionally, at trial the defense attorneys presented other evidence discrediting the State's eyewitnesses and the angles of the bullets. They established, through their cross-examination of Habbe and Dr. Knecht, that their

6. There are also conflicting theories on whether the fracture caused by the right leg would have prevented Marshall from walking away from the place near the pickup (where Knecht alleges the struggle ensued) to the pools of blood several feet away (where Marshall's body was discovered). Bennett opined that Marshall could have walked away, which is contrary to the State's theory.

7. In addition to the conflicting theories on the calf wound, at the Habeas hearing, Bennett stated that the bullet causing the non-life-threatening thigh wound passed through Marshall's left-front thigh and re-entered Marshall's right calf. He determined that there were 7 wounds caused by 5 bullets and that some of the wounds were inconsistent with Marshall standing when he was shot. He

stated that "all wounds are consistent with recently having been shot while he was lying on his right side on the ground."

8. Gary Colbath, Jr., testified at the habeas hearing that it was common for his father to informally consult with Henry on forensic issues. Although Gary Colbath, Jr., was not directly involved in the forensic consult with Henry, he did note that his father had spoken with Henry in preparation for trial. He said it was likely that his father sent Habbe's report to Henry for analysis prior to defense counsels' meeting with Habbe and discussed it with him.

9. Dr. Knecht, the petitioner's brother, was on duty at the hospital and attempted to save Marshall's life after the shooting.

theory was consistent with the wounds inflicted. Importantly, Bennett's theories do not resolve all of the inconsistencies in the defense theory, such as why no blood was found between the spot where Knecht alleges the shooting occurred and the pools of blood where Marshall allegedly fell.

[¶ 20.] Failure to hire an expert is not, per se, error. As the Eighth Circuit has acknowledged with regard to failure to call an expert, if the omitted evidence "could not have exonerated" the defendant or "rebutted the state's case," the verdict rendered was not unreliable, nor the proceeding "fundamentally unfair." *See Conley v. Groose*, 26 F.3d 126, 1994 WL 203379 (8th Cir. (Mo) 1994). In order for Knecht's claim to succeed, he has to show this Court that the lack of expert testimony undermined confidence in the outcome of this case, and he has not carried this burden. *See Kluck v. State*, 30 S.W.3d 872, 877 (Mo.App. S.D.2000). "The fact that an error by counsel might have had some conceivable effect on the outcome is not sufficient." *Id.* (citation omitted). There is no compelling proof that calling an expert in Knecht's case would have done more than strengthen the self-defense theory of counsel. "Conjecture or speculation is not sufficient to establish the required prejudice flowing from the failure to call a witness to testify." *Id.* at 876. We have previously agreed with this proposition. As stated in *Siers v. Class*, "there is no prejudice if, factoring in the uncalled witnesses, the government's case remains overwhelming." 1998 SD 77, ¶ 27, 581 N.W.2d 491, 497 (citation omitted). The fact that an expert could have strengthened the self-defense theory does not equate to ineffective assistance. In this case, trial counsels' tactic was to have the jury consider the self-defense theory, and they succeeded in having the trial court instruct the jury on the theory of their defense.

[¶ 21.] This Court has previously analyzed whether failing to obtain an expert constitutes ineffective assistance of counsel in *Davi*, 2000 SD 30, 609 N.W.2d 107. In that case, the defendant's trial counsel made a "sound strategic decision to not call a serological expert" because an expert would merely have increased the percentage of men who could potentially have deposited a semen stain on the rape victim. *See id.* at ¶ 32. We held in *Davi* that the increased number did not change the alibi defense, and other evidence still would have indicated guilt. The same principle for not reversing on ineffective assistance of counsel grounds holds true in *Knecht*. There is no question of who did the shooting in this case. Defense counsel analyzed whether an expert was needed, but as a matter of strategy, determined that an expert was not necessary. Counsel instead chose to cross-examine the State's witnesses (Habbe and Knecht) to demonstrate how the doctors' theories were not inconsistent with the defense. Importantly, we have acknowledged that "[t]he decision to call (or not to call) an expert is a matter of trial strategy." *Davi*, 2000 SD 30 at ¶ 31, 609 N.W.2d at 114–115 (citing *Garritsen v. Leapley*, 541 N.W.2d 89 (S.D.1995)). "The defendant must show more than that the trial strategy of the defense counsel backfired or that another attorney would have prepared and tried the case in a different manner." *Weddell*, 2000 SD 3 at ¶ 32, 604 N.W.2d at 283 (internal citations omitted). "This Court will not second guess the strategic decisions of trial attorneys." *Id.* (citation omitted). In the words of the habeas judge: "A difference [in] trial strategy is not ineffective assistance of counsel, and this Court will not second guess experienced counsel, which Gary Colbath, Sr.,

most definitely was, regarding trial tactics or strategy." In this case, defense counsels' cross-examination of Habbe, along with the medical testimony of Knecht, succeeded in getting the self-defense theory to the jury. Appellate courts are not to sit as Monday morning quarterbacks and second-guess counsels' decisions that were made in the heat of battle. *See id.* at ¶ 32. To find ineffective assistance in this case would amount to doing just that.[10]

[¶ 22.] There is a presumption that counsel acted competently. *Ramos,* 2000 SD 111 at ¶ 12, 616 N.W.2d at 92. Knecht has not overcome that presumption of competent representation. Therefore, we affirm the habeas court's decision in all regards.

[¶ 23.] GILBERTSON, Chief Justice, and KONENKAMP, Justice, and GORS, Acting Justice, concur.

[¶ 24.] SABERS, Justice, dissents.

SABERS, Justice (dissenting).

[¶ 25.] Knecht claimed he shot Marshall in self-defense and there was physical evidence to support it but his counsel failed to properly present it through an expert witness. This was error constituting ineffective assistance of counsel under *Strickland* because it resulted in prejudice to his defense.

[¶ 26.] Knecht argues that he shot Marshall while Marshall was attacking him and trying to pull him to the ground. There was evidence, based on the bullet entry and exit wounds that supported

Knecht's argument. This evidence, had it been fully understood by Knecht's counsel and presented to the jury through an expert, would have challenged the State's theory of events. This evidence, however, was neither fully developed nor explained during trial.

[¶ 27.] The majority opinion states that failure to obtain an expert is not deficient per se. Even the most experienced trial counsel, however, may lack expertise in some areas and need the help of an expert. *See Driscoll v. Delo,* 71 F.3d 701 (8th Cir.1995); *Foster v. Lockhart,* 9 F.3d 722, 726 (8th Cir.1993); *Starr v. Lockhart,* 23 F.3d 1280, 1284 (8th Cir.1994). "When the appellant shows that defense counsel 'failed to exercise the customary skills and diligence that a reasonably competent attorney would exhibit under similar circumstances,' that presumption must fail." *Driscoll,* 71 F.3d at 709 (quoting *Starr,* 23 F.3d at 1284).

[¶ 28.] Whether the gunshot wounds were consistent with Knecht's or the State's theory was an issue of great significance. Even Knecht's counsel admitted that the gunshot wound evidence was significant and would have aided in the defense theory. Accordingly, because of the complexity of the evidence and the conflicting theories as to the manner of the shooting, the need for an expert was readily apparent. Under these circumstances, a reasonable defense lawyer should have taken the time and effort to thoroughly understand all of the evidence. It was

---

**10.** Knecht failed to support his position that counsel's failure to obtain an expert deprived him of his Sixth Amendment right to counsel because none of the cases he cited are factually analogous to Knecht's case. *See Driscoll v. Delo,* 71 F.3d 701, 709 (8th Cir.1995) (holding a defense lawyer's failure to take "some measures" to understand whether the blood on the murder weapon matched that of the vic-

tim constituted ineffective assistance of counsel); *Starr v. Lockhart,* 23 F.3d 1280, 1290 (8th Cir.1994) (holding expert was necessary to explain extent of defendant's retardation); *Proffitt v. United States,* 582 F.2d 854, 859–60 (4th Cir.1978) (holding a psychiatric evaluation was necessary to determine if defendant had a defense based on the fact that he was an alleged sociopath or psychopath).

deficient performance for Knecht's counsel not to retain a forensic expert.

[¶ 29.] Knecht was prejudiced because he was unable to put on a complete defense. At the habeas hearing, pathologist Dr. Habbe testified that the bullet wound on Marshall's right calf and the bullet discovered in his pant leg were consistent with Knecht's testimony that Marshall had been on the ground when he shot him. Had his counsel obtained a forensic expert to study the pathology of the bullet wounds, they would have better been able to corroborate Knecht's testimony and theory of self-defense.

[¶ 30.] Furthermore, Knecht's counsel wholly failed to raise the argument that the killing was not effected in a cruel and unusual manner, either during trial or on direct appeal. The failure to do so constituted deficient performance and resulted in prejudice to Knecht.

[¶ 31.] To sustain a conviction for first degree manslaughter committed without a design to effect death but inflicted in a cruel and unusual nature under SDCL 22-16-15(2), the evidence must show that the killing was "shocking or barbaric" and done in a manner "sufficiently unique in ferocity, duration and manner of accomplishment." *State v. Lange*, 82 S.D. 666, 671, 152 N.W.2d 635, 638 (1967). In *Lange*, this Court examined the phrase "in a cruel and unusual manner." *Id.* One of the cases cited in *Lange* explained that in order to sustain a conviction for a killing done in a cruel and unusual manner:

> there must be some refinement or excess of cruelty sufficiently marked to approach barbarity, and to make it especially shocking; and the unusual character of the manner displayed must stand out as sufficiently peculiar and unique to create surprise and astonishment and to be capable of discrimination as rare and strange.

*Lange*, 82 S.D. at 671, 152 N.W.2d at 638 (citing *State v. Knoll*, 72 Kan. 237, 83 P. 622 (1905)). This Court recognized that:

> [t]hough the savageness of the assault, the deceased's pain and injuries coupled with the disparity between defendant's physical appearance and decedent's presented a spectacle of brutality, still [the Kansas Supreme Court] said the manner of death was very ordinary in a fight of this type and lacked the unusual quality contemplated by the legislature.

*Lange*, 82 S.D. at 671–72, 152 N.W.2d at 638. This Court also cited to *People v. Vollmer*, which explained that "[t]o be 'cruel and unusual' the manner of commission of a homicide must have in it some aggravating element, something out of the ordinary, something shocking or barbaric." 299 N.Y. 347, 87 N.E.2d 291, 293 (1949).

[¶ 32.] The killing of Marshall does not rise to the level of cruel and unusual. It simply does not approach the barbarity contemplated by this Court and others in their analyses of the definition of cruel and unusual. Both Knecht and Marshall were intoxicated. They were involved in an altercation while in the bar. After Knecht left the bar, he was attacked from behind by Marshall, and he claims he shot rapidly and sporadically to repel him. There was little "refinement or excess of cruelty sufficiently marked to approach barbarity." Had Knecht shot Marshall so as to immobilize him and then continued to shoot him with the intent to inflict pain or torture, such facts could show a barbaric killing and one that is "sufficiently unique in ferocity, duration and manner of accomplishment." But such facts are not present here as he simply shot until Marshall fell.

[¶ 33.] Knecht's counsel never argued to the jury that this death was not cruel and unusual; nor objected that the evidence was insufficient to sustain a finding

that death was effected in a cruel and unusual manner. His counsel admitted at the habeas hearing that he never considered researching this issue and acknowledged that an argument may have existed on those grounds. Clearly, the failure to argue to the jury or object to the sufficiency of the evidence cannot be classified as trial strategy. He had nothing to lose and everything to gain. Counsels' performance was deficient.

[¶ 34.] Knecht was clearly prejudiced by his counsels' failure. If Knecht had been able to substantiate his claim of self-defense with expert testimony, there was nothing cruel or unusual about his conduct. A shooting done or started in self-defense is inconsistent with the definition of cruel and unusual.

[¶ 35.] While each count of ineffective assistance of counsel meets the *Strickland* standard, cumulatively, they present an even more compelling case. Had Knecht's counsel obtained a forensic expert, they would have been able to bolster the theory of self-defense. Accordingly, they would have better been able to argue that this was a bar fight and not a cruel and unusual killing. Absent the errors by Knecht's trial counsel, there is a reasonable probability that the jury would not have found him guilty under SDCL 22–16–15(2) because it was not cruel and unusual. It was simply the death of one of two intoxicated individuals from another bar fight.